IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**DENNIS MILLER,**

**Plaintiff,**

**v.**

**JANSSEN PHARMACEUTICA
PRODUCTS, L.P. and
ALZA CORPORATION,**

**Defendants.**                                             **No. 05-cv-4076-DRH**

## MEMORANDUM and ORDER

**HERNDON, District Judge:**

### I. Introduction and Background

Now before the Court is Plaintiff's motion for class certification (Doc. 81). Naturally, Defendants oppose the motion (Doc. 87). On April 19, 2007, the Court heard argument on Plaintiff's motion and took the matter under advisement. Based on the record, the oral argument, and the applicable case law, the Court denies Plaintiff's motion for class certification.

On November 29, 2006, Dennis Miller, on behalf of himself and all others similarly situated, filed a Second Amended Class Action Complaint against Janssen Pharmaceutica Products, L.P. ("Janssen"), and Alza Corporation ("Alza") for product liability-strict liability (Count I); product liability-negligence (Count II); breach of express warranty (Count III); breach of implied warranty (Count IV);

violation of all states' consumer protection statutes (Count V) and unjust enrichment (Count VI) (Doc. 78). Plaintiff is a "user of the DURAGESIC 75 MCG (fentanyl transdermal system) CII patch ("Duragesic patch")" (Doc. 78, ¶ 2). Plaintiff seeks class certification "on behalf of all persons who have purchased, and/or use or used the Duragesic patch." (Doc. 78, ¶ 2). Plaintiff alleges that "Defendants, through distributors, have injured and defrauded consumers by manufacturing, distributing and selling Duragesic patches that are faulty, either in design or production, whereby they deliver too much or too little medication and thus, caused Plaintiff and the class personal and economic injury." (Doc. 78, ¶ 2). Plaintiff alleges that he "has been damaged by overexposure to the medication and by symptoms related withdrawal due to the involuntary overdose." (Doc. 78, ¶ 9). Plaintiff also alleges that Janssen, a pharmaceutical company, sold and distributed the Duragesic patch and that Alza, a pharmaceutical and medical systems company, manufactured the Duragesic patch. (Doc. 78, ¶, ¶ 10-12).

Plaintiff moves this Court to certify the following nationwide class:

> All prescription users, other than Defendants, of the Duragesic 75 mcg/hr patch, lot numbers 0327192, 0327193, 0327294, 0327295, or 0330362 (the "Recalled Lots"), who either suffered opiate overdoes or opiate withdrawal, but not death, during their use of the Recalled Lots of the Duragesic 75 mcg/hr patches.[1]

---

[1] Plaintiff amended his class definition after filing the motion for class certification (Doc. 93, pg. 2). The previous class definition contained in the Second Amended Complaint was "All persons, their estates, administrators or other legal representatives, heirs or beneficiaries throughout the United States who were prescribed, purchased, or were otherwise provided and used a defective DURAGESIC patch who suffered either economic or physical injury in the past five years; and excludes any class member and/or class member's estate who claims a wrongful death

Plaintiff contends that the proposed class meets the requirements of Fed.R.Civ.P. 23(a)( and 23(b)(3).

## II. Facts

Alza manufactured and Janssen marketed and distributed the Duragesic pain patch. The patch is a prescription pain patch used to treat moderate to severe chronic pain. It is a transdermal system that is adhered to a patient's skin and continually releases a rate controlled medication over a period of time- 72 hours. The medication contained in the patch is called fentanyl, which is an opiod. Fentanyl is contained in a gel mixture inside each patch and passes from a reservoir within the patch through the patient's skin. It comes in five strengths: 12 mcg/hr, 25 mcg/hr, 50 mcg/hr, 75 mcg/hr and 100 mcg/hr. It is similar in appearance to an oblong, oversized Band-Aid™. Fentanyl is intended only for patients who already receiving and have become tolerant to some other form of opioid pain relief therapy.

The Duragesic 75 is manufactured using the Bodolay One Form Fill and Seal Machine ("Bodolay 1"). The patch is constructed of a three-layer laminate comprised of ethylene-vinyl acetate ("EVA") rate controlling membrane, a silicone adhesive, and a protective liner, with the fentanyl stored in a drug reservoir in between the rate controlling membrane and a backing. The Duragesic lots in question each number roughly 500,000 patches per lot. All defective lots contained the same "fold-over defect" which caused the patches to leak their active ingredient,

---

due to the Defendant's product or actions." (Doc. 78, ¶ 27).

fentanyl, when applied to the patient.  Each lot's defects were attributed to the same "root cause" which caused the same type and number of defects that Defendants later recalled.

Around February 12, 2004, Alza began receiving a substantial increase in complaints over a two-week period concerning Duragesic 75, Lot # 0327192 patches.  This lot was on the market for one month.  Alza determined that the patches were defective in that the patch seals contained breaches that were identical in location and size.  All complaints had the same root cause, a "fold-over" defect.  The backing film on the patch was not positioned correctly on the Bodolay 1 pull wheels.  Alza also determined that the fold-over defect was unique to the Duragesic 75 due to the width of the unused material along the edge of the patch.

From this defect there could either be increased or decreased exposure of the opiate fentanyl.  The consequences of an increased exposure of fentanyl include hypoventilation, dyspnea, apnea, respiratory depression, death, arrhythmia, bardycardia, somnolence, confusion, abnormal coordination, nausea and vomiting.  The symptoms of not enough fentanyl are severe withdrawal symptoms (because the patients are often opioid tolerant).  They also experience breakthrough pain and classic opiate withdrawal symptoms such as nausea, vomiting, shivering, anxiety, diarrhea, increased respiratory rate, hypertension or tachycardia.  Further, the patients do not recognize these symptoms as withdrawal because they are wearing the patch.

On February 14, 2004, Alza initiated a Class I Recall for Lot # 0327192. Notification of the recall affecting Lot # 0327192 was sent to physicians, hospitals, pharmacies, distributors, medical associations, and retail pharmacy associations in all 50 states, the District of Columbia and Puerto Rico on February 16, 2004. By March 5, 2004, Alza found 67 reports that indicated patch leakage for Lot # 0327192. In a March 12, 2004 Memo, Alza stated that it knew of similar fold over defects in Lot #0372294 and potentially in Lots 0372193 and 0372295. On or about April 5, 2004, Alza recalled the other lots. That same day, an expanded recall notice was sent to physicians, hospitals, pharmacies, distributors, medical associations, and retail pharmacy associations in all 50 states, the District of Columbia and Puerto Rico.

Alza manufactured these patches between August 2003 and March 2004. Alza determined that they defectively manufactured anywhere from .72% to 5% (totaling 18,000 to 125,000) of the patches throughout the United States. However, the precise number was not known.

The FDA investigated the Alza plant in Vacaville, California, the Bodolay 1, the defective patches sent in from complaining users, interviewed employees and reviewed data on the patches from February 20, 2004 to June 16, 2004. The FDA issued an Establishment Inspection Report and a 483 Inspectional Observations ("483'). The 483 provided seven inculpatory findings regarding Alza's conduct as to the patches. Five of these findings were relevant to the lots released in the US:

(1) the fold-over defect also occurred in October 2001, but that Alza wrongly determined that the October 2001 incidents were isolated events and that Alza did not take corrective action preventing distribution of the 2004 recalled lots;

(2) Alza's sampling plan among the lots was deficient;

(3) that Alza did not even follow its deficient plan. It allowed distribution of trays of patches that it knew contained defects;

(4) Alza allowed for the release of later recalled lot 0330362 well after it knew that at least two lots exhibited numerous fold-over defects. Shipment began after the initial 2/15/04 recall and still released the 211,680 Lot 0330362 patches even after it knew that a second lot also exhibited the same fold-over defects; and

(5) that Alza's In-process and Quality Control checks were inadequate.

Patches from the five recalled lots went to wholesale distributors in 40 states and Puerto Rico. From there, the patches went to retail distributors such as pharmacies, medical providers, and ultimately, patients, in all 50 states, the District of Columbia and Puerto Rico.

In January 2004, Miller was prescribed Duragesic for treatment of chronic pain. The United States Department of Veterans Affairs ("VA") pharmacy advised him on the proper use and potential side effects of the patch. He was also advised not to drink while using the patch. However, Miller drank a third of a fifth of Tequila per week at the same time he was using the patch. At first, Miller was prescribed the 25 mcg/hr patch and then shortly thereafter he was prescribed the 50

mcg/hr patch. On February 24, 2004, Miller was prescribed the 75 mcg/hr patch. Miller received one-month supplies of the Duragesic 75 patches from the defective Lot # 0327295 on February 24, 2004 and on March 3, 2004. He used the patches and began exhibiting the following symptoms: hard time breathing, stomach pain, vomiting, hot flashes, anxiety, perfuse sweating, diarrhea and experienced severe breakthrough pain. In April, 2004, Miller refilled his Duragesic prescription and at that time, received from the VA pharmacy information on the recall. On April 20, 2004, Miller's medical records show that he told the Veterans Affairs Medical Center Nurse LaDonna M. Haase that "he went into withdrawals when his Fentanyl patches leaked." After the Duragesic recall, Miller began receiving his pain medication by combining a 50 mcg/hr and 25 mcg/hr patch, rather than using a 75 mcg/hr patch. Miller's symptoms continued even after he switched from the 75 mcg/hr patch to the 50 mcg/hr and 25 mcg/hr patches.

    Miller has a long history of health problems including diabetes, arthritis, aches and pains, and stomach problems. He served in the Air Force and was exposed to Agent Orange while stationed in Vietnam. He attributes numerous of his health problems to his Agent Orange exposure. Miller has been unable to work since the early 1980s. He receives disability benefits from the VA for his back injuries, headaches, stomach problems, and hiatal hernia. He also suffers from pain in multiple joints of the hip, knee and cervical spine, diabetic neuropathy and arthritis. Miller also has a history of psychological problems. He has regularly seen the VA

psychiatrist since 1984 and has been diagnosed as suffering from post-traumatic stress syndrome, anxiety neurosis and depression.

Plaintiff moves this Court for class certification under Fed.R.Civ.P. 23(a) and 23(b)(3). Plaintiff argues this case, unlike many injury-producing mass tort medical product cases found unsuitable for class treatment, is uniquely suited because the Duragesic 75 mcg/hr patch contained uniform defects, manifested finite and immediate symptoms and that medical and pharmaceutical records exist to demonstrate the patient's use of the patch and the symptoms exhibited from the defective patch. Further, Plaintiff contends that Defendants' uniform course of conduct towards Plaintiff and the class members provides an ideally suited case for certification in that Alza defectively manufactured the patches and that Janssen distributed the patches.

### III. Class Certification Standard

A party seeking certification of a class under Rule 23 of the Federal Rules of Civil Procedure must demonstrate that the proposed class meets all four requirements of Rule 23(a): (1) the class is so numerous that joinder of the class members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the class representatives are typical of the claims or defenses of the class as a whole ("typicality"); and (4) the representatives will fairly and adequately protect the class interests ("adequacy"). ***See* Fed.R.Civ.P. 23(a)(1)-(4);** ***Uhl v. Thoroughbred Tech.***

*& Telecomms., Inc.,* **309 F.3d 978, 985 (7th Cir. 2002)**. If a proposed class meets the prerequisites of Rule 23(a), it must then be shown that the class satisfies at least one of the three requirements of Rule 23(b) as well. *See Hispanics United of DuPage County v. Village of Addison, Ill.,* **160 F.R.D. 681, 686 (N.D. Ill. 1995);** *Hardin v. Harshbarger,* **814 F.Supp. 703, 706 (N.D. Ill. 1993)**. "A party seeking class certification bears the burden of proving that each of the requirements under Rule 23 has been met, and a failure by the movant to satisfy any one of these prerequisite elements precludes certification." *Westefer v. Snyder,* **Civil Nos. 00-162-GPM, 00-708-GPM, 2006 WL 2639972, at \*2 (S.D. Ill. Sept. 12, 2006) (citations omitted)**. "When appropriate … an action may be brought or maintained as a class action with respect to particular issues, … and the provisions of [Rule 23] shall then be construed and applied accordingly." **Fed.R.Civ.P. 23(c)(4)**.

  A court has broad discretion to determine whether a proposed class meets the Rule 23 certification requirements. *General Tel. Co. of S.W. v. Falcon,* **457 U.S. 147, 160 (1982);** *Trotter v. Klincar,* **748 F.2d 1177, 1184 (7th Cir. 1984)**. In making this determination, Rule 23 should be construed liberally to support its policy of favoring the maintenance of class actions. *See King v. Kansas City S. Indus., Inc.,* **519 F.2d 20, 25-26 (7th Cir. 1975)**. As a general principle, a court is not allowed to engage in an analysis of the merits to determine whether the case should be maintained as a class. *Retired Police Ass'n v. City of Chicago*, **7**

**F.3d 584, 596 (7th Cir. 1993)**. However, a district court must make a preliminary inquiry into the merits of the case if some of the considerations under Rule 23 overlap the merits. ***Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672 (7th Cir.), cert. denied, 122 S.Ct. 348 (2001);** *see also* **Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974);** ***Retired Chicago Police Ass'n*, 7 F.3d at 598-99 (noting that in some cases, some discovery may be necessary to determine whether certification is appropriate and that "the boundary between a class determination and the merits may not always be easily ascertainable");** ***Eggleston*** *v.* **Chicago Journeymen Plumbers' Local Union No. 130, 657 F.2d 890, 895 (7th Cir. 1981)**. As Judge Easterbrook stated in **Szabo**, "[b]efore deciding whether to allow a case to proceed as a class action . . . a judge should make whatever factual and legal inquiries are necessary under Rule 23." **249 F.3d at 676**. Thus, Courts may not simply take Plaintiffs' allegations as true, for "[b]oth the absent class members and defendants are entitled to the protection of independent judicial review of the plaintiff's allegations." *Id.* **at 677**.

### IV. Implied Prerequisites to Class Certification

Courts have implied two prerequisites to class certification that must be satisfied prior to addressing the requirements of Rule 23(a): (1) the class must be sufficiently defined so that the class is identifiable; and (2) the named representative must fall within the proposed class. ***Alliance to the End Repression v. Rochford*,**

**565 F.2d 975, 977 (7th Cir. 1977)**.  Proper identification of the proposed class serves two purposes.  First it alerts the court and the parties to the potential burdens class certification may entail.  **Simer v. Rios, 661 F.2d 655, 670 (7th Cir. 1981)**.  In this way the court can decide whether the class device simply would be an inefficient way of trying the lawsuit for the parties as well as for its own congested docket."  **Id.**  Second, proper class identification insures that those individuals actually harmed by defendant's wrongful conduct will be the recipients of the awarded relief.  **Id**.  "It is absolutely necessary that for a class action to be certified, the class must be susceptible to a precise definition.  Therefore, the class definition must be sufficiently definite so that it is administratively feasible for the Court to determine whether a particular individual is a member of the proposed class."  **Clay v. American Tobacco Co., 188 F.R.D.  483, 490 (S.D. Ill. 1999)**.  "Furthermore, for a class to be sufficiently defined, the identity of the class members must be ascertainable by reference to objective criteria ."  **Id. (citation omitted)**.

Plaintiff argues that the class membership is objectively and readily ascertainable through medical, pharmaceutical and FDA records.  Specifically, Plaintiff contends that each element of the class definition is objectively reasonable in that: (1) a patient's medical and pharmacy records show whether a doctor prescribed him the Duragesic patch; (2) the patient's pharmacy records will show if the patches she received were from a recalled lot; and (3) the patient's medical records will show whether the patient suffered fentanyl overdose or withdrawal

during the use of the recalled Duragesic patch. Thus, Plaintiff maintains that all of this information is readily ascertainable through the FDA's Adverse Reporting System, which records all three elements of the class definition in the MedWatch Report. Defendants counter that the proposed class is not ascertainable in that no objective criteria exist to determine class membership. Defendants argue that the Court will have to conduct discovery and evidentiary hearings for each would-be class member just to determine if he or she is in the class. Defendants maintain that experiencing symptoms of opiate withdrawal or overdose does not establish that a defective patch was responsible as the side effects of normal Duragesic use are the same symptoms one might experience with fentanyl overdose or withdrawal and that this can be caused by many other factors. Further, Defendants argue that the FDA records do not demonstrate whether an individual was injured by a defective patch. The Court agrees with Defendants.

Here, the Court finds that it would be nearly impossible to figure out who is in the class. Under the definition of the proposed class, there is no way to determine the identity of all persons who used a defective patch, let alone those who both used a defective patch and suffered some consequent injury. In order to determine the members of the class, the Court would have to conduct mini-trials for each would-be class member to determine whether he or she is in the class. The class member would have to prove that he or she used a defective patch *and* that he or she was injured by the defective patch. The best proof of a defective patch would

be the used patch itself, yet it seems highly unlikely that a patient would have retained a used patch. Assuming that a defect is shown, proof of injury and causation also would require individualized expert testimony. Establishing causation and injury would not be easy as the symptoms complained of are the same as the drug's listed side effects, and in some instances (depending on the patient's medical history) the symptoms are the same as those for the illness or injury for which the drug was prescribed. Here, no objective criteria exist to ascertain class membership. Considerable cost and time would have to be expended by the Court and parties before the class could even be identified.

Plaintiff also contends that Miller falls within the proposed class. Plaintiff argues that he is a member in the class because his medical and pharmaceutical records show that his doctor prescribed him the Duragesic patch; that he received a patch from recalled lot # 0327295; and that he suffered withdrawal effects when his patch leaked. Plaintiff further argues that Alza acknowledged the defective patches long term consequences and these are the same symptoms that Miller complained of in the months after his use of the defective patch. Defendants assert that Miller has not demonstrated that he falls within the proposed class and that Miller has not demonstrated the he was injured by the use of a defective Duragesic patch. Defendants contend that his symptoms continued after he quit using the Duragesic 75 mcg/hr patch and that his symptoms may have been side effects from normal Duragesic use or attributed to his depression,

diabetes, anxiety, gastro reflux disease or obesity, his exposure to Agent Orange or his use of alcohol with the patch.

As to whether Miller falls within the class, the Court finds this to be questionable. If Miller, with all his maladies, is the "typical" class member, then he is a prime example of why the Court finds that the class is not ascertainable. Miller's own medical history and use/misuse of the patch suggests that it is possible that his symptoms may or may not have been caused by a defective Duragesic patch. Thus, even to determine whether the named class representative, Miller, falls within the class, the Court would have to conduct a mini-trial. Thus, the Court finds that Plaintiff has not satisfied the implied prerequisites for class certification. Moreover, as stated below, the Court finds that Plaintiff also fails to satisfy the remaining requirements of Rule 23(b)(3) because the massive number of individualized factual issues render his claim unmanageable as a class action.[2]

## V. **Rule 23(b)(3)**

Rule 23(b)(3) requires a showing that:

> Questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

"In considering Rule 23(b)(3)'s requirements, the court must review the substantive elements of plaintiff's cause of action, the proof necessary for the various elements

---

[2] The Court need not address the requirements under Rule 23(a) as Plaintiff has not sustained his burden regarding the implied prerequisites or the Rule 23(b)(3) requirements.

and the manageability of the trial on these issues." **Simer, 661 F.2d at 672**. The court is obligated to determine whether the existence of individual issues preclude certification, and must take into account the substantive elements of the claims so as to envision the form a trial on the issues would take. Where liability determinations are both individual and fact intensive, class certification under Rule 23(b)(3) is improper.[3]

In addition to failing the mandates of the implied prerequisites to class certification, this case clearly falls outside the preview of Rule 23(b)(3). The Court finds that individualized issues of causation and damages would predominate over any common issues. Plaintiff maintains that common issues of liability predominate

---

[3]Courts generally refuse to certify nationwide classes in cases involving personal injury, products liability and breaches of warranty. **See, e.g., In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1015 (7th Cir. 2002)("No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and superiority requirements of Fed.R.Civ.P. 23(a), (b)(3). Yet state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold that other warranty, fraud, or products-liability suits may not proceed as nationwide classes."); In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293 (7th Cir. 1995)(in decertifying nationwide class against manufacturer of blood solids, Judge Posner notes that "most federal courts... refuse to permit the use of the class-action device in mass tort cases); Szabo v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001)(proposed nationwide class in product defect case alleging breach of warranty and fraud "poses serious problems about choice of law, the manageability of the suit, and thus the propriety of class certification.... [F]ew warranty cases ever have been certified a class actions - let alone as nationwide classes, with the additional choice-of-law problems that complicate such a venture.").** Plaintiff contends that this case is the exception to the rule and cites **Mejdrech v. Met-Coil Systems Corp., 319 F.3d 910, 911 (7th Cir. 2003)**, in which the Seventh Circuit affirmed certification of a mass tort class action, to support his position. However, **Mejdrech** is not on all fours with this case. In **Mejdrech**, an environmental pollution case, the Seventh Circuit affirmed certification of the class to determine whether and what extent defendant caused contamination of the groundwater beneath the class members homes and left "remaining claimant-specific issues to individual follow on proceedings." **Id. at 911.** The Seventh Circuit noted that the manageability problems posed by many proposed nationwide mass tort classes was not present because *all* of the class members were residents of the same state, they were proceeding under the same federal and state laws and class status did not apply to the damages phase. **Id. at 912.** Such is not the case here.

over any individual issues. Plaintiff contends that if he proves that Defendants defectively manufactured, inspected or distributed the defective Duragesic 75 lots, that proof would be the same for any other person seeking to establish that fact. Thus, Plaintiff asserts that the only issues remaining would be that of causation and damages which would not preclude class certification as these issues are readily ascertainable through medical and pharmacy records as well as through the FDA. The Court does not agree. Plaintiff's proposed class fails to satisfy Rule 23's typicality, predominance and superiority requirements.

As stated previously, the Court would have to determine via a mini-trial for each class member the following: whether the patch or patches he or she used actually leaked; whether the leak(s) resulted from defects; whether the symptoms he or she identifies were caused by the leak(s); whether the symptoms differed in a significant way from the side effects disclosed on the patches; whether the patient was using alcohol or other medications; whether the patient's underlying illness could have caused any of the symptoms; what medical attention was obtained for the overdose or withdrawal; whether the patient was using the recalled patches when the leaks occurred. Extensive discovery, tailored to each class member's individual fact pattern must be obtained from each class member's medical history to answer these questions. The fact that these questions need to be answered by each class member will overwhelm any common issues and thus, render the class unmanageable.

Lastly, the Court need not address the choice of law issue as Plaintiff

clearly has not met the implied prerequisites and the requirements of Rule 23(b)(3). The obvious difficulties in managing this purported class action are pertinent to the Court's decision to deny certification. The proposed class action is unmanageable in light of the individualized inquiries. Considerations of manageability and judicial economy would not be served by certification. A class action is not a superior method of adjudication when extensive individualized proceedings to determine causation, damages and reliance are unavoidable.

## VI. Conclusion

Accordingly, the Court **DENIES** Plaintiff's motion for class certification (Doc. 81).

**IT IS SO ORDERED.**

Signed this 30th day of April, 2007.

/s/        David   RHerndon
**United States District Judge**